602 So.2d 798 (1992)
Otis Lee WINDHAM
v.
STATE of Mississippi.
No. 07-KA-59619.
Supreme Court of Mississippi.
May 20, 1992.
Rogers J. Druhet, Meridian, for appellant.
Michael C. Moore, Atty. Gen., Deirdre McCrory, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before HAWKINS, P.J., and PRATHER and ROBERTSON, JJ.
PRATHER, Justice, for the Court:

I. INTRODUCTION

A. Procedural History
In November 1985, the Kemper County Grand Jury indicted 21-year-old Otis Lee Windham under Miss. Code Ann. §§ 97-3-19 & 97-3-21 (1972) for the June 1985 murder of 79-year-old Albert Thurston Calvert.
At the Kemper County Circuit Court, a jury found Windham guilty, and the trial judge sentenced him to life imprisonment. On appeal, this Court reversed and remanded for a new trial. See Windham v. State, 520 So.2d 123 (Miss. 1988).
On remand, another jury found Windham guilty of murder, and Judge Robert W. Bailey sentenced him to life imprisonment. Windham appealed. This Court affirms.

*799 B. Facts

The facts or evidence adduced in the second trial is essentially the same as that adduced in the first trial. See Windham v. State, 520 So.2d 123, 124 (Miss. 1988). The following is a summary of this evidence viewed in a light most favorable to the State.
Albert Calvert and his wife, Betty, owned and operated a small grocery store in the Zion Community of Kemper County. Albert was seventy-nine years old and had no right arm; it had been cut off at the shoulder. Betty was seventy-eight years old. On June 26, 1985, around 6:00 to 6:30 p.m., twenty-one-year-old Otis Lee Windham pulled into Calvert's Grocery to buy gas.
No one disputes that, as Otis pumped gas, he and Albert argued over a debt Otis owed Calvert's Grocery. Betty walked to the scene and noticed Otis gripping her husband's arm. She immediately attempted to pry Otis' grip loose, but she did not succeed. Wanda Hampton, while fishing in the Calverts' nearby pond, overheard Betty say: "If you don't leave him alone, I'll call the sheriff." When Windham refused to release Albert, Betty struck Otis in the face with her hand. Otis then reached through his car window, retrieved a carpenter's hammer, and hit her head hard enough to render her unconscious. According to Otis, Albert "never hit me but he started back in the store and that's when I grabbed him and throwed him." Meanwhile, Betty regained consciousness and witnessed her husband's body fall "limber as a dishrag" in front of her. The State contended  and the jury obviously believed  that Otis had assaulted Albert with the hammer,[1] which resulted in his death a short time later.

II. ANALYSIS
Otis presented three issues for this Court's disposition.

A. Whether the verdict was contrary to the overwhelming weight of the evidence?
In this appeal, Otis contends the verdict was against the overwhelming weight of the evidence. More specifically, he contends that the trial judge should have granted him a directed verdict, j.n.o.v., or new trial on the basis of the so-called "Weathersby Rule."[2]
Otis raised this issue in his first appeal, and this Court deemed it to be devoid of merit. See Windham, 520 So.2d at 127 ("We have considered the other assignments of error addressed to the sufficiency of the evidence and the Weathersby Rule, and find them without merit."). In considering Otis' renewed contention, this Court refers to Johnson v. State:
At the outset, several general observations need to be made. The evidence offered in the second trial was almost identical to that offered in the first. Furthermore, Johnson's assignments of error almost duplicate those in the first appeal.
... .
Turning to the case before this Court, it is noted that the only change in the evidence of any significance in the second trial is Johnson's personally testifying and denying any part in the crime and asserting an alibi. Fifteen of his eighteen assignments of error were decided adversely to Johnson on the first appeal. Johnson has admitted this fact, merely stating that he "resubmits those .. . assignments of error, originally submitted, for further review." This Court *800 holds the same to be res judicata and therefore does not address them again.
529 So.2d 577, 579-80 (Miss. 1988) (citing West v. State, 519 So.2d 418, 424-25 (Miss. 1988)).
In sum, Johnson v. State is dispositive of this issue. Accordingly, this Court reaffirms on this issue under the doctrine of res judicata.[3]

B. Whether a circumstantial-evidence instruction should have been granted?
Otis next contends that the judge should have granted a circumstantial-evidence instruction (Instruction D-12).
This Court has held that, "where there is direct evidence of a crime, the circumstantial-evidence instruction need not be given." King v. State, 580 So.2d 1182, 1191 (Miss. 1991) (quoting Gray v. State, 549 So.2d 1316, 1324 (Miss. 1989)). In the case sub judice, the evidence adduced is not wholly circumstantial. Thus, the judge did not err by refusing the instruction.
In sum, this Court affirms on this issue.

C. Whether the trial judge "erred in granting Instruction S-3 which allowed the jury to consider `depraved heart' type murder[4] when the appellant was originally indicted for deliberate design murder, deprived the defender of a fair manslaughter consideration, and denied him equal protection of law?"
Through this unartfully-framed issue, Otis presents two contentions. He contends that Instruction S-3, a "depraved heart" murder instruction, should not have been granted: (1) because it (Instruction S-3) "amounted to a denial, or substantial diminishing of a manslaughter consideration"; and (2) because it was "not supported by the facts."[5]

1.
Specifically, Instruction S-3 provides:
The Court instructs the Jury that, if you believe from the evidence in this case, beyond a reasonable doubt, that on the 26th day of June, 1985, in Kemper County, Mississippi, the deceased, Albert Thurston Calvert, was a living person, and the Defendant, Otis Lee Windham, did wilfully, unlawfully and feloniously act in a manner eminently dangerous to Albert Thurston Calvert and others, evincing a depraved heart, regardless of human life, by beating Albert Thurston Calvert with a Hammer which resulted in the death of Albert Thurston Calvert, then you shall find the Defendant guilty of murder.
Vol. I, at 61. Otis contends that this instruction should not have been granted because it "amounted to a denial, or substantial diminishing of a manslaughter consideration." At the trial level, Otis phrased his objection accordingly: "I object to S-3 ... [because it] is designed to deprive the defendant of manslaughter  or any manslaughter *801 or any excusable homicide instruction." In essence, Otis' contention is that the crime of depraved-heart murder as defined by Section 97-3-19(1)(b) is indistinguishable from culpable-negligence manslaughter as defined in Miss. Code Ann. Section 97-3-47.
Instruction S-3 derives its authority specifically from statutory law, which provides in part:
(1) The killing of a human being without the authority of law by any means or in any manner shall be murder in the following cases:
(b) When done in the commission of an act eminently dangerous to others and evincing a depraved heart, regardless of human life, although without any premeditated design to effect the death of any particular individual... .
MISS. CODE ANN. § 97-3-19(1)(b) (1991 Supp.) (emphasis added).
The familiar manslaughter statute, which Otis contends is diminished by Instruction S-3, provides:
Every other killing of a human being, by the act, procurement, or culpable negligence of another, and without authority of law, not provided for in this title, shall be manslaughter.
MISS. CODE ANN. § 97-3-47 (1972). Countering Otis' contention, the State asserts that § 97-3-47 "specifically excludes homicides falling under § 97-3-19(1)(b)." "Therefore," the State concludes, "depraved-heart murder and culpable-negligence manslaughter are mutually exclusive; by the express terms of the Mississippi Code, they do not overlap."
Otis' contention is unpersuasive. Depraved-heart murder and culpable-negligence manslaughter are distinguishable simply by degree of mental state of culpability. In short, depraved-heart murder involves a higher degree of recklessness from which malice or deliberate design may be implied. See, e.g., W. LAFAVE & A. SCOTT, CRIMINAL LAW §§ 30 & 70 (1972); United States v. Browner, 889 F.2d 549, 552 (5th Cir.1989).
In sum, Instruction S-3 did not "amount[] to a denial, or substantial diminishing, of a manslaughter consideration" by the jury. This conclusion is consistent with this Court's decision in at least one other case in which a depraved-heart murder instruction and a culpable-negligence manslaughter instruction were properly granted. See Johnson v. State, 475 So.2d 1136, 1139-40 & 1148 (Miss. 1985); accord State v. Smith, 415 A.2d 562 (Me. 1980) (depraved-heart and culpable-negligence instructions given in this case involving death from "brutal and senseless beating"); State v. Goodall, 407 A.2d 268 (Me. 1979) (same). Thus, Otis' contention is deemed devoid of merit.

2.
Next, Otis contends that Instruction S-3 should not have been granted because it was "not supported by the facts." Otis' contention is devoid of merit. The evidence clearly establishes the existence of actual or implied malice or deliberate design. More specifically, the evidence establishes the possibility that Otis could have killed Calvert "while acting in a manner eminently dangerous to others [i.e., the Calverts] and evincing a depraved heart, regardless of human life." Compare with Johnson v. State, 475 So.2d 1136, 1139-40 (Miss. 1985).
In Johnson v. State, an unknown individual summoned police officers to Christine Johnson's apartment. There, they found the bruised and cut body of Christine's 3 1/2-year-old son. Christine claimed that her son died from an accidental fall. An autopsy, however, revealed that her son died from extensive blows to the head. At the Coahoma County Circuit Court, a jury convicted Christine of murdering her son under the depraved-heart statute. Affirming the conviction, this Court stated:
It has long been the case law of this state that malice aforethought, premeditated design, and deliberate design all mean the same thing. See Dye v. State, 127 Miss. 492, 90 So. 180 (1921); Hawthorne v. State, 58 Miss. 778 (1881); McDaniel v. State, 8 Smed. and M. 401 (Miss. 1847). Furthermore, in Talbert v. State, 172 Miss. 243, 159 So. 549, 551 (1935), the Court had under consideration two jury instructions, one of them being *802 in the precise language of the "depraved heart" murder statute. The Court, referring to the forerunner of § 97-3-19(1)(a) (sec. 985 subds. (a) and (b) of the Code of 1930), said the following:
"This statute but epitomizes the common law found.... Murder is the voluntary killing of any person of malice prepense or aforethought, either express or implied by law;[6] the sense of which word malice is not only confined to a particular ill-will to the deceased [such as anger, hatred, and revenge], but is intended to denote ... an action flowing from a wicked and corrupt motive, a thing done malo animo, where the fact has been attended with such circumstances as carry in them the plain indications of a heart regardless of social duty and fatally bent upon mischief. [And therefore malice is implied from any deliberate, cruel act against another, however sudden]."
475 So.2d at 1139 (quoting Talbert v. State, 172 Miss. 243, 250, 159 So. 549, 551 (1935), and Commonwealth v. Webster, 59 Mass. (5 Cush.) 295, 304 (1850)). See also Fairman v. State, 513 So.2d 910, 913 (Miss. 1987) (holding that the evidence established that defendant acted in a manner eminently dangerous to another or others and evincing a depraved heart).
The facts of Johnson are analogous to those of the case sub judice. In the case sub judice, Otis assaulted the Calverts with a hammer during a dispute over a debt he owed them but, according to Otis, he "never intended to hurt no one." Lack of intent notwithstanding, his use of a hammer to assault a 79-year-old, one-armed man (who was running away) and his 78-year-old wife may, at the very least, be described as grave recklessness manifesting utter disregard or indifference to the resultant creation of eminent danger to the life of both Albert and Betty. This description alone fits within the modern view of the scope of depraved-heart murder.
Under the traditional view, death which resulted from a reckless act directed toward a particular individual would not be deemed to be within the scope of depraved-heart murder statutes. To constitute depraved-heart murder, the act must have manifested a reckless indifference to human life in general. See F. WHARTON, THE LAW OF HOMICIDE § 129 (3rd ed. 1907). For example, an unjustified shooting at a passing train or into a house, which generally poses a risk to a group of individuals and which results in death, is a familiar example of traditional depraved-heart murder. See People v. Jernatowski, 238 N.Y. 188, 144 N.E. 497 (1924) (shooting into a room); Banks v. State, 85 Tex.Crim. 165, 211 S.W. 217 (1919) (shooting into caboose of passing train).
The traditional view has since evolved. An act which poses a risk to only one individual and which results in that individual's death may also be deemed depraved-heart murder. For example, death which resulted from a beating has been deemed to be within the scope of depraved-heart murder statutes. See, e.g., People v. La Mountain, 155 A.D.2d 717, 547 N.Y.S.2d 430 (1989) (death resulted from repeated punching, kicking, and stomping); State v. Smith, 415 A.2d 562 (Me. 1980) (death resulted from beating and stabbing); DuBose v. Lefevre, 619 F.2d 973 (2d Cir.1980) (death resulted from beating); State v. Goodall, 407 A.2d 268 (Me. 1979) (death resulted from "brutal and senseless beating"); State v. Wardle, 564 P.2d 764 (Utah 1977) (death resulted from "multiple blunt blows"); see also Regina v. Ward, 1 Q.B. 351 (1956) (oft-cited case in which mother shook baby to death); Solomon v. Commissioner of Correctional Servs., 786 F. Supp. 218, 222 (E.D.N.Y. 1992) (death from choke hold). More pertinent to the facts of the case sub judice, death which *803 resulted from injuries inflicted through use of an object  including use of a hammer  has been deemed to be within the scope of depraved-heart murder statutes. See State v. McGranahan, 415 A.2d 1298 (R.I. 1980) (death from injuries inflicted through use of a bottle); State v. Woodbury, 403 A.2d 1166 (Me. 1979) (death from injuries to head inflicted through use of two-by-four piece of wood); People v. Rivera, 59 A.D.2d 675, 398 N.Y.S.2d 538 (1977) (use of belt buckle); State v. Day, 572 P.2d 703 (Utah 1977) (use of "heavy wooden stick"); see also People v. Boston, 153 A.D.2d 534, 545 N.Y.S.2d 146 (1989) (defendant convicted of attempted depraved-heart murder for nonfatal beating using a hammer), rev'd on other grounds, 555 N.Y.S.2d 27 (1990); Finnegan v. State, 33 Md. App. 251, 364 A.2d 124 (1976) (in affirming conviction for "assault with intent to murder," court opined that defendant could have been convicted under various theories of murder  including depraved-heart murder  if victim had died from hammer blows); cf. Grassia v. Scully, 707 F. Supp. 1410 (S.D.N.Y. 1989) (use of gasoline which ignited).
In Johnson v. State, 475 So.2d 1136 (Miss. 1985), this Court left no question regarding the view to which Mississippi adheres. That is, this Court construed Miss. Code Ann. § 97-3-19(1)(b) (Supp. 1984)  the depraved-heart murder statute  in a manner which encompasses a reckless and eminently dangerous act directed toward a single individual. Indeed, this Court can perceive no rationale for characterizing a horrendously-violent act, like the one committed by Otis, as manslaughter rather than depraved-heart murder, simply because, under the traditional view, the act must have been directed toward "human life in general" as opposed to one individual in particular. A distinction between the risk of death to one particular individual and the risk of death to more than one individual is a senseless and outmoded one which this Court properly discarded six years ago in Johnson v. State. See R. PERKINS, CRIMINAL LAW 32 (1957) (Under the depraved-heart theory, "a wanton and reckless disregard of an obvious human risk is with malice aforethought even if there was no actual intent to kill or injure."); cf. O.W. HOLMES, THE COMMON LAW 53 (1881) ("[K]nowledge that the act will probably cause death ... is enough in murder as in tort."); Commonwealth v. Chance, 174 Mass. 245, 252, 54 N.E. 551, 554 (1899) (As Justice Holmes further explained: "[I]t is possible to commit murder without any actual intent to kill or to do grievous bodily harm, and that, reduced to its lowest terms, `malice,' in murder, means knowledge of such circumstances that according to common experience there is a plain and strong likelihood that death will follow the contemplated act, coupled perhaps with an implied negation of any excuse or justification. `The criterion in such cases is to examine whether common social duty would, under the circumstances, have suggested a more circumspect conduct.'") (quoting case law).

3.
In sum, the judge granted instructions on various theories of culpability  including simple murder, depraved-heart murder, inexcusable manslaughter, and excusable manslaughter. The jury found Otis guilty of "murder"  which means the jury accepted a simple-murder theory or a depraved-heart murder theory. In either event, the evidence or facts justified an instruction on, and a finding of, depraved-heart murder. This conclusion is consistent with case law in this State as well as the modern view espoused in other jurisdictions. See generally Annotation, Validity and Construction of Statute Defining Homicide By Conduct Manifesting "Depraved Indifference," 435 A.L.R.4th 311 (1983 & 1990 Supp.); see W. LAFAVE & A. SCOTT, CRIMINAL LAW § 70 (1972); R. PERKINS, CRIMINAL LAW 32 (1957). This Court therefore affirms on this issue.

III. CONCLUSION
Otis Lee Windham has been afforded two trials by jury. In each case, the jury concluded: (1) that the evidence proves beyond a reasonable doubt the existence of the element of malice  actual or implied; and (2) that no justifiable or mitigating circumstance *804 existed to support a finding of manslaughter.
This Court is convinced beyond a reasonable doubt that the evidence supports the jury verdict. A third trial is not warranted. The murder conviction is therefore affirmed.
AFFIRMED.
ROY NOBLE LEE, C.J., and ROBERTSON, SULLIVAN, PITTMAN and McRAE, JJ., concur.
HAWKINS, P.J., and ROBERTSON, J., concur by separate written opinions.
BANKS, J., dissents by separate written opinion, joined by DAN M. LEE, P.J.
HAWKINS, Presiding Justice, concurring:
I concur in affirming, but with serious misgivings. As the majority notes, in Johnson v. State, 475 So.2d 1136 (Miss. 1985), and Fairman v. State, 513 So.2d 910 (Miss. 1987), this Court crossed the bridge upon which I have concern. I should have dissented then.
Miss. Code Ann. § 97-3-19 (1972) states:
§ 97-3-19. Homicide  murder defined.
.....
(a) When done with deliberate design to effect the death of the person killed, or of any human being;
(b) When done in the commission of an act eminently dangerous to others, and evincing a depraved heart, regardless of human life, although without any premeditated design to effect the death of any particular individual;
(c) When done without any design to effect death, by any person engaged in the commission of the crime of rape, burglary, arson, or robbery, or in any attempt to commit such felonies.
We are only dealing with subparagraphs (a) and (b) above. Subparagraph (a) deals, of course, with a killing in which A intentionally slays B. It is that simple.
Subparagraph (b) is something quite different.[1] It states that while A is engaged in an act that is very dangerous to others he happens to kill B, and he had a "depraved heart" in committing this extremely dangerous act, then he is guilty of murder even though he had no actual design to kill any particular person. Classic examples of this type of murder are shooting into an occupied building or bus, or putting a bomb in a building or car. Gentry v. State, 92 Miss. 141, 45 So. 721, 721 (1908):
It is, of course, a well-known general principle that if one fires into a crowd of persons with a spirit of malignity and utter recklessness of human life, and kills any one in the crowd, he is guilty of murder, because of the recklessness and willfulness and malignity of the shooting generally.
In Johnson and Fairman, both cases in which the dangerous act was directed to only one person not others, and deliberately so as well, we held that the defendant could be prosecuted under subparagraph (b). In both Johnson and Fairman the accused were excellent candidates for prosecution and conviction under subparagraph (a). To sustain a conviction of murder under subparagraph (a), there was no necessity in either case for bringing in a subparagraph (b) murder charge, and which it was not. Fairman, especially, was a case of either murder by a deliberate design or a classic case of manslaughter in the heat of passion.
As the majority notes, the full facts of this case are not in the present opinion, but are detailed in Windham v. State, 520 So.2d 123 (Miss. 1988). Mr. and Mrs. Calvert operated a small country store. Windham, a 20-year-old customer, knew Mr. Calvert kept two firearms in his place of business, a rifle at the front door, and a pistol beneath the cash register. Windham got into an argument with them over a bill. As Windham was leaving, the argument continued outside, and, according to Windham, he picked Mr. Calvert up and threw *805 him down. Mr. Calvert, a 79-year-old one-armed man, was killed. Windham also struck Mrs. Calvert with a hammer he had in his car. Following this incident, Windham drove to the sheriff's office and reported it.
At the trial the pathologist testified there were two injuries to Mr. Calvert's head, which he did not believe would have been sustained by Windham's throwing him to the ground. There were only two evidentiary possibilities, either Windham killed Mr. Calvert in throwing him to the ground, or he hit him with some instrument such as a hammer.
In the first trial it never occurred to the prosecution to give a subparagraph (b) murder instruction. We reversed because of confusing instructions blurring the distinction between a subparagraph (a) murder by deliberate design with the crime of manslaughter committed in the heat of passion. We would have done the law a favor, if not Windham, by affirming then, because the prosecution has gone even further, more egregiously blurring the distinction between crimes, and made this slaying a subparagraph (b) killing, even though there is no proof whatever in this record that in committing the act which slew Mr. Calvert, Windham was engaged in any act dangerous to anybody but Mr. Calvert. Furthermore, the act clearly was deliberately done to harm Mr. Calvert and, if Windham was guilty of anything, it had to be either a subparagraph (a) murder or manslaughter in the heat of passion. Miss. Code Ann. § 97-3-35 (1972).[2]
If the slaying in this case was indeed a subparagraph (b) murder, then there is no way any court can ever direct a verdict to a jury that the defendant is at most guilty of manslaughter. Every instance of a slaying in the heat of passion is perforce committing an act dangerous to another. Whether the defendant is convicted of murder or manslaughter will depend upon the whim or circumstance of the jury hearing the case, not upon understandable instructions delineating what constitutes each crime.
The distortion of language does not end yet, unfortunately. What about "depraved heart?" The majority having decided in Fairman (where the defendant hit the victim with a stick), and here that even though Windham had no intention to kill Mr. Calvert (a subparagraph (a) murder), he nevertheless could have done so with a "depraved heart."
Well, if Windham did not actually intend to kill Mr. Calvert, what are the possibilities in his state of mind? It could have been that Windham was afraid Mr. Calvert was about to reach into the store and get that rifle or his pistol, as he testified. Or, it could have been anger, rape, ignorance, stupidity, and perhaps mean to boot. But depraved? After this incident Windham drove straight to the sheriff's office and reported what had happened. Was this the act of a man with a "depraved heart?"
I cannot recall of reading or ever hearing of any man who planted a bomb, blew up a bridge, or shot into an occupied bus going to a sheriff or policeman and telling him what he had just done.[3]
The dictionary the State furnished me reads that "depraved" means "debasement, corruption, perversion."
On the question of "depraved heart," the Court makes no distinction whatever, gives no guide to the jury, between a subparagraph (b) slaying and manslaughter committed in the heat of passion.
That the Legislature, if it chose to do so, could very well make the crime of slaying in the heat of passion a murder, I have no doubt. U.S. v. Browner, 889 F.2d 549 (5th Cir.1989). I am equally certain that the Legislature has not done so. We have.
*806 If we read the statute as the Legislature manifestly meant it to be read, we would encounter no difficulty. This statute says quite simply that a person who (1) engages in some act extremely dangerous to others and (2) who does so with an evil state of mind  e.g., placing a bomb in a building  this meets the requirement. If we would leave it at that, we would have no problem. We had none in the first 150 years we had the statute. It is when a Court seeks to expand the statute to mean something else that we run into trouble.[4]
When the distinction between criminal statutes, which over the years have accumulated well-defined meanings, is blurred, we create problems for the prosecution and defense, and ourselves as well.
ROBERTSON, Justice, concurring:
Today's debate, whether it matters that Otis Lee Windham intended to put at risk one or many, misses the point, but our law's perennial and schizophrenic romance with criminal intent makes the miss forgivable. For the most laudable of motives, many who have made our criminal law have for centuries fixed their gaze upon something they have seen as the criminal mind and have found that fundamental. Out of this these once saw the insanity defense constitutionally compelled. Sinclair v. State, 161 Miss. 142, 153-54, 132 So. 581, 582 (1931). We think mens rea the core of criminality and certainly of murder,[1]see, e.g., Welch v. State, 566 So.2d 680, 684-85 (Miss. 1990), until we see it will not work.
Intuition and consensus demand we condemn many who act without mens rea. We punish "depraved heart" murderers[2] and "felony" murderers[3] because they put others at great risk, and we punish them the same as "deliberate design"[4] or "malice aforethought" murderers.[5] Miss. Code Ann. § 97-3-21 (Supp. 1991). What is common to all is our view that each acted with *807 extreme indifference to life. That the killer's indifference be augmented by malice or meanness or malignity of heart, or whatever other meaningless metaphor we might imagine, adds nothing of note. And the same of whether he endangered one or many.
A man's state of mind is hard enough for him to know, much less for others to prove without his help. The objective standard has its logic and its pull. This is seen by our experience with deliberate design murder. We say the design need not have been formed far before the fatal moment, e.g., Holland v. State, 587 So.2d 848, 872 (Miss. 1991); Goldsby v. State, 226 Miss. 1, 16, 78 So.2d 762, 767 (1955); Howard v. State, 212 Miss. 722, 725, 55 So.2d 436, 438 (1951); Williams v. State, 163 Miss. 475, 480-81, 142 So. 471, 472 (1932); and Johnson v. State, 140 Miss. 889, 895, 105 So. 742, 743 (1925), though we (sometimes) gag at "but for an instant" instructions. See Blanks v. State, 542 So.2d 222, 227 (Miss. 1989) (citing cases); and particularly, the first appeal in this case, Windham v. State, 520 So.2d 123, 126 (Miss. 1987). We sense whom we should sentence, so we struggle to imply intent from the use of a deadly weapon. See Carter v. State, 493 So.2d 327, 330 fn. 1 (Miss. 1986) (citing cases); Dickins v. State, 208 Miss. 69, 43 So.2d 366, 373-74 (1949); Smith v. State, 205 Miss. 283, 294, 38 So.2d 725, 726 (1949). That we scale down the penalty for the attempt reinforces that we regard central in fact the risk and the result, not the actor's purpose or intent. Miss. Code Ann. § 97-1-7 (1972). And what of the gleam in the eye. Perhaps Holmes was right, when he wrote long ago, that the law
by the very necessity of its nature, is continually transmuting those moral standards into external or objective ones, from which the actual guilt of the party concerned is wholly eliminated.
Holmes, The Common Law 38 (1881).
The criminal mind mentality that has so infected the coherence of our criminal law fails four-fold. It fails of linguistic adequacy. I am satisfied the scientist has long eschewed speaking such unintelligible terms as "malice aforethought" and "depraved heart." I see no place for them in a modern criminal code, save possibly counsel's final argument to the jury. The criminal mind mentality fails to regard the relevant realities of the behavioral phenomena we seek to regulate. It talks of "malice aforethought" and "depraved heart" and even "heat of passion" as though these were discrete cognitive states susceptible not only of capture in words but of discernment on contested proof. I have long thought these states more real in the lawyer's mind than in the actor's. It fails of formal realizability. Our juries have not in fact been able to achieve a congruence between declared rule and official action. Finally, it offends the rule of relevant resemblances  that we group those who in relevant respects resemble each other and whose conduct on principle ought to be judged alike, while separating souls not so similar. By insisting we consider the elements beyond the objective appraisal of risk and circumstances, plus volition, we perpetuate our legal schizophrenia and enhance the risk of varying and inconsistent readings and enforcement of the law.
Notwithstanding, I accept that the power to define crimes and prescribe punishments is legislative in nature and is constitutionally vested in the legislature of this state. Faraga v. State, 514 So.2d 295, 302, 313 (Miss. 1987); Allen v. State, 440 So.2d 544, 545 (Miss. 1983). Howell v. State, 300 So.2d 774, 780 (Miss. 1974). I trust we have backed off from Sinclair and now accept that the legislature may define a crime which depends on no mental element and consists only of forbidden acts or omissions. Roberson v. State, 501 So.2d 398, 401 (Miss. 1987); Wright v. State, 236 So.2d 408, 413 (Miss. 1970). As Presiding Justice Hawkins notes, the legislature has acted and provided us a text at least as long ago as 1848, and, for language largely written in other times when people thought in other ways, our murder statute holds up rather well. I accept without hesitation that it is a legislatively-mandated legal text we read and that it must be read so as to give effect to all of its provisions, so far as that is possible. Pinkton v. State, 481 So.2d 306, 310 (Miss. 1985); State v. Russell, 185 Miss. 13, 21, 187 So. 540, 542 (1939). If the act provided discrete and mutually exclusive *808 categories of murder  deliberate design murder and eminently dangerous murder  I would accede, no matter how irrational I thought the division. See, e.g., Pennock v. State, 550 So.2d 410, 413 (Miss. 1989).
Subsection 1(b) "eminently dangerous" murder includes three important phrases. Most prominent, the fatal act must have been "eminently dangerous to others." I concur in part with Presiding Justice Hawkins' linguistic suggestion that "imminently" ought be found within this wording. I say "in part" because, in my view, the phrase imports a danger that is clear and present. What is important, the legal language expresses a concern with the probable side effects of intended acts, acts intended only in the sense that the actor did what he did volitionally and not by accident. The law proscribes acts that create a great risk of grave harm to others, and so it provides the objective standard.
The third phrase, "regardless of human life," again imports an objective standard. It suggests a category of acts that, by reference to their circumstances, will be perceived by other reasonable persons as manifesting extreme indifference to life.
"Evincing a depraved heart" is the puzzler. I doubt it would mean much to a cardiologist. Resort to the dictionary seems similarly unavailing. In Gentry v. State, 92 Miss. 141, 145, 45 So. 721 (1908), we read this phrase "a spirit of malignancy," but hardly advanced the ball. I take it no one will dispute that the phrase must be seen a metaphor, a euphemism, regarding the actor's cognitive, not cardiac, function. I am open to the suggestion otherwise, but I do not see that it says anything of consequence independent of "eminently dangerous to others" and "regardless of human life."
I see no rational distinction in criminal culpability between acts regardless of human life when compared with an act regardless of a particular human life. Practical people are not concerned with fine lines between states of mind when each act creates great risk of grave harm to another person. Do we not hold "A" for murder where he shoots at "B" intending to kill "B" but misses "B" and instead strikes and kills "C"? See, e.g., Ross v. State, 158 Miss. 827, 831-32, 131 So. 367, 368 (1930). This, of course, leads quickly to the point that Subsection (1)(b) "eminently dangerous" murder engulfs and subsumes Subsection (1)(a) "deliberate design" murder, and it does. They are concentric circles around conduct with (1)(a) the smaller within. Can anyone find a case in our reports where a defendant has been convicted of Subsection 1(a) "deliberate design" murder and where, had the prosecution proceeded solely under Subsection 1(b) "eminently dangerous" murder, we would not reject on appeal a challenge to the weight and sufficiency of the evidence? And, so a deliberate reading together of (1)(a) and (1)(b) renders intent  malice aforethought  if you must, a bit of lagniappe.
We are told this would cut into manslaughter's domain for "every instance of a slaying in the heat of passion is perforce committing an act dangerous to others." (Hawkins, P.J., concurring, p. 805) That is certainly true, and it may indeed, in practical effect, deny a trial court the power to direct a verdict that the defendant is at most guilty of manslaughter. What we are not told is how and why this would be a loss to the law or the society it serves.
BANKS, Justice, dissenting:
I agree with Justice Hawkins that the "depraved heart" provision in our murder statute does not reach acts directed at a single person. One is presumed to intend the natural consequences of one's acts. Johnson v. State, 461 So.2d 1288, 1293-94 (Miss. 1984) quoting Lee v. State, 244 Miss. 813, 146 So.2d 736, 738 (1962). Conduct directed at a single individual which is likely to produce death may evince a deliberate design to kill. Berry v. State, 575 So.2d 1, 12 (Miss. 1990). To the extent that the jury finds that it does not, the perpetrator is, or may be, guilty of manslaughter. Mease v. State, 539 So.2d 1324 (Miss. 1989).
The "depraved heart" provision is designed to reach different conduct, undirected as to a single individual or the individual harmed as fully explained in Justice Hawkins' opinion. As Justice Robertson incisively notes, the majority reading of "depraved *809 heart" murder subsumes both deliberate design murder and most, if not all, of our various manslaughter statutes. That's the problem. While it may be difficult to explain why this would be a loss to society, the power of the legislature to define crimes includes the power to make distinctions. Our duty to construe statutes to give effect to all of their provisions compels us to recognize such distinctions. Pinkton v. State, 481 So.2d 306, 310 (Miss. 1985); Mississippi Public Service Commission v. City of Jackson, 328 So.2d 656, 658 (Miss. 1976); State v. Russell, 185 Miss. 13, 21, 187 So. 540, 542 (1939) (Declining to construe a section of a conspiracy statute so as to subsume other more specific provisions).
Because the jury here was allowed to convict on "depraved heart" murder, I dissent.
DAN M. LEE, P.J., joins this dissent.
NOTES
[1] Albert contended that he merely "grabbed [him] and pushed him and got into [his] car and left." Vol. II, at 119-20. An autopsy, however, revealed that Albert's injuries were inconsistent with a mere fall to the ground. Albert sustained scalp lacerations, skull fractures, and extensive brain injury  all of which the pathologist opined were caused by a "blow" from a blunt object such as a hammer. As metaphorically described by the pathologist, the blows reflected "home run hits." Id. at 58.
[2] Pursuant to the Weathersby Rule, "[w]here the defendant or the defendant's witnesses are the only eyewitness to the homicide, their version, if reasonable, must be accepted as true, unless credible witness or witnesses for the state, or by the physical facts or by the facts of common knowledge." Weathersby v. State, 165 Miss. 207, 209, 147 So. 481, 482 (1933).
[3] Windham also raised a related sub-issue: Whether the trial judge properly refused Instruction D-11? Appellant's Brief at 9. This instruction is based on the Weathersby Rule. See Weathersby v. State, 165 Miss. 207, 147 So. 481 (1933).

Griffin v. State is dispositive of this sub-issue. 495 So.2d 1352 (Miss. 1986). In Griffin, this Court held that "the Weathersby Rule is not the proper subject of an instruction to the jury." Id. at 1355 (citing cases).
Pursuant to Griffin, this Court concludes that this sub-issue is devoid of merit and that the trial judge properly denied Instruction D-11.
[4] This type of murder is found in other jurisdictions under various rubrics  such as "depraved indifference," "indifferent murder," "reckless murder," and "depraved heart." See, e.g., State v. Goodall, 407 A.2d 268 (Me. 1979).
[5] Otis also seems to be contending that the instruction should not have been granted because he was indicted for "deliberate design" murder  not for "depraved heart" murder. This contention is devoid of merit. Statutory law provides that "[i]n an indictment for homicide, it shall not be necessary to set forth the manner in which or the means by which the death of the deceased was caused, but it shall be sufficient to charge in an indictment for murder, that the defendant did feloniously, wilfully, and of his malice aforethought, kill and murder the deceased." MISS. CODE ANN. § 99-7-37 (1972). Accordingly, the judge properly granted an instruction on "depraved heart" murder under the Kemper County Grand Jury indictment  which was clearly legally sufficient.
[6] According to Professor Rollin M. Perkins of the Hastings College of Law:

In the early authorities, an intent to kill was said to be "implied" from [certain] act[s] ... despite [an] obvious effort to avoid killing if possible. Now, ... this fiction is abandoned and it is frankly stated that ... a reckless and wanton disregard of an obvious human risk is with malice aforethought even if there is no actual intent to kill or injure.
R. PERKINS, CRIMINAL LAW 32 (1957)
[1] My guess is that the authors meant "imminently" rather than "eminently" dangerous to others. "Imminently" suggests something that is likely to occur at any moment. The word "eminently," however, has been in this code section at least since 1848.
[2] 97-3-35. Homicide  killing without malice in the heat of passion.
The killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense, shall be manslaughter.
[3] It can at least be said that in Johnson the facts fully supported the accused acting with a "depraved heart." A small child was beaten to death.
[4] The majority could very well argue that a man who commits manslaughter has a "depraved heart." Perhaps so. The lady who cheats in a game of bridge, the bootlegger who sells whiskey on a Sabbath may also have a "depraved heart." Indeed, the Good Book informs us we are all sinners, which means the entire human race has, in one sense or the other, a "depraved heart." The "depraved heart" the Legislature was talking about, however, was one that could put you into the penitentiary for life. The Legislature obviously meant a much more restricted meaning of "depraved heart" than that suggested by the majority, and relied upon the courts' discernment in properly interpreting it.
[1] I have heretofore sought to show this effort misguided. See, Groseclose v. State, 440 So.2d 297, 302-06 (Miss. 1983); Gill v. State, 488 So.2d 801, 809, (Miss. 1986) (Robertson, J., concurring); and Laney v. State, 486 So.2d 1242, 1247 (Miss. 1986) (Robertson, J., concurring).
[2] See Miss. Code Ann. § 97-3-19(1)(b) (Supp. 1991), includes within murder

The killing of a human being without the authority of law by any means or in any manner... . [w]hen done in the commission of an act eminently dangerous to others and evincing a depraved heart, regardless of human life, although without any premeditated design to effect the death of any particular individual; . .. .
I refer to this brand of murder hereafter as "eminently dangerous" murder, not "depraved heart" murder.
[3] Miss. Code Ann. § 97-3-19(1)(c) (Supp. 1991) defines murder as including

The killing of a human being without the authority of law by any means or in any manner ... [w]hen done without any design to effect death by any person engaged in the commission of any felony... ., or in any attempt to commit such felonies.
Compare the felony murder definition of capital murder in Miss. Code Ann. § 97-3-19(2)(e) (Supp. 1991).
[4] Miss. Code Ann. § 97-3-19(1)(a) defines murder as

The killing of a human being without the authority of law by any means or in any manner ... [w]hen done with deliberate design to effect the death of the person killed, or of any human being.
[5] No act of the legislature uses "malice aforethought." The statute, Subsection (1)(a), speaks of "deliberate design." This Court has reintroduced "malice aforethought" into homicidal parlance and, without necessity or profit, we have long regarded "malice aforethought" and "deliberate design" as synonymous. See, e.g., Fairman v. State, 513 So.2d 910, 913 (Miss. 1987); Johnson v. State, 475 So.2d 1136, 1139 (Miss. 1985); Lancaster v. State, 472 So.2d 363, 367 (Miss. 1985); and McDaniel v. State, 8 Sm. and M. 401, 418 (1847).